IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

DESIREE PEREZ, OLGA ZAYAS,                         CASE NO.:
MILADYS GARCIA GONZALEZ, and
DENISE MILAGROS GONZALEZ ESCRIBANO,                JURY TRIAL DEMANDED

      Plaintiffs,

v.

JAVON HADLEY,

      Defendant.

_____/

## COMPLAINT

Plaintiffs, Desiree Perez ("Desiree"), Olga Zayas ("Olga"), Miladys Garcia Gonzalez ("Millie"), and Denise Milagros Gonzalez Escribano ("Denise") (collectively "Plaintiffs") by and through undersigned counsel, hereby file this Complaint against Defendant, Javon Hadley ("Hadley" or "Defendant"), and allege the following:

## NATURE OF THE ACTION

1.     Plaintiffs are living every family's nightmare.  Their loved one, D.H.[1] is trapped in an appalling and dangerously abusive relationship, and her torturer and oppressor, the Defendant, who is a ticking timebomb, ready to explode, owns and controls her.  Plaintiffs live in terror of the explosion, that the Defendant may kill her one day.  By this lawsuit, Plaintiffs are shouting from the rooftops for the world to hear that they love D.H., and her family will fight with every fiber of their beings to protect her.  This lawsuit is motivated by the family's love for D.H., the trauma they have endured from seeing her brutally abused and controlled by Defendant, and Defendant's

---

[1] Plaintiffs are referring to their loved one as "D.H." to protect her identify as a nonparty and as a victim of domestic abuse and rape.

harm to Plaintiffs and their entire family.

2.      As set forth in detail below, Javon Hadley is an abuser whose relentless and sadistic pattern of cruelty and abuse has devasted the lives of Plaintiffs and their entire family.  Hadley has been in a relationship with Desiree's beloved daughter, D.H. for many years and ultimately, they married in 2024.  Throughout his relationship with D.H., and while living in Desiree's home in Miami (the "Family Home"), with Desiree's father and other family members (the "Family"), Hadley's violence, manipulation, indoctrination, degradation, isolation, subjugation, economic abuse and gaslighting of D.H. has known no bounds.  He has subjected her to relentless and merciless physical, mental, sexual and financial abuse, psychological torture, exploitation, and unspeakable conduct that has shattered the lives, peace and security of D.H.'s family and threatens their entire world, leaving them in enduring and constant terror and pain, fearful for her life and mental wellbeing, as well as their own.

3.      Although Desiree lives in New Jersey, she maintains the Family Home in Miami for her father, Epifanio Julio Gonzalez ("Julio"), who suffers from severe dementia, Olga Zayas ("Olga") Julio's significant other for more than 30 years, and for the entire Family's benefit and enjoyment.  Desiree does this and much, much, more for the Family because she is utterly devoted to them; they are everything to her.  Miladys Garcia Gonzalez ("Millie") is Julio's cousin and is regularly present in the Family Home as she is Julio's caregiver. Denise Milagros Gonzalez Escribano is Desiree's cousin and also resided in the Family Home.

4.      Javon Hadley took a wrecking ball to this once safe haven and turned it into a house of horrors. Indeed, Hadley's conduct while living in the Family Home not only terrorized D.H., but also Desiree, Olga, Denise, and the many other family members who love D.H., subjecting them to paralyzing fear for their own safety, security, and privacy, and that of D.H.'s.

5.      Over a period of years, Desiree, Olga, Millie, Denise and the rest of D.H.'s family have themselves suffered immensely; forced to bear witness to the horrific, terrifying, and escalating pattern of abuse and coercive control Hadley has wielded over D.H. They recognize and ruminate over the devastating impact this torture has had on D.H.'s mental health and former love of life, and it is soul-crushing for them.

6.      From the very beginning of their relationship, Hadley displayed a calculated intent to dominate, control, degrade, and monetize D.H. at the expense of her family. D.H.'s family has watched in agony as Hadley has isolated D.H. from friends and family and eroded all her support systems to ensure total control over her life.  Hadley chose his victim well as D.H. has cognitive and emotional vulnerabilities, which have enabled him to effectively control and abuse her. Hadley's exploitation of D.H.'s vulnerabilities and insecurities have had a devastating impact on D.H., as witnessed by her family.

7.      Over time, Hadley has become so domineering and abusive, that D.H. is not empowered to act of her own volition and is seemingly convinced of her dependency on him, which has tragically led her to stay in the relationship and protect him from any accountability for his abusive conduct.  Indeed, she is so under his control she cannot even see her own abuse, even when confronted with incontrovertible evidence.  She is brainwashed and thus unable to see the truth.

8.      To obtain and maintain control over D.H., Hadley has used techniques identified by experts as an insidious form of abuse referred to as coercive control.[2]  Experts have determined

---

[2]  *See*  https://www.myflfamilies.com/services/abuse/domestic-violence/get-help/what-domestic-violence. Similarly, in proposed legislation in 2022, the Florida State Senate proposed the below definition of coercive control at https://www.flsenate.gov/Session/Bill/2022/1106/Amendment/798132/HTML

(1) "Coercive control" means a pattern of threatening, humiliating, or intimidating actions by one family or household, member against another family or household member, which actions are used to harm, punish, or frighten the family or household member and make him or her dependent on the other family or

that when these tools are used over a long period of time, they erode and indeed destroy an individual's psychological well-being, essentially brainwashing or enslaving their victims.  These tools include:

a.   <u>Indoctrination</u>. Indoctrination occurs where an abuser instills a new belief system in an individual through manipulation and coercion and eliminates individual autonomy and independent decision-making.

b.   <u>Physical abuse</u>.  Physical abuse, i.e., the infliction of harm on someone, leads not only to physical injury, but also psychological injury in that it causes the individual who sustained the abuse to question what it means about them that someone has inflicted such pain, injury and suffering upon them.

c.   <u>Surveillance</u>. Surveillance causes an individual to believe that the abuser is omnipresent, and no matter where she goes or what she does, he will have his eyes on her. Surveillance can include tracking an individual's cell phone, ensuring her location services are enabled, checking her e-mail, checking her text messages, checking her social media, and physically showing up unexpectedly at places where she is.

d.   <u>Isolation</u>. Isolation allows an abuser to remove an individual's social support system that would buffer the effects of psychological distress. Without social support, it is increasingly difficult to extricate oneself from the abusive relationship or situation.

e.   <u>Subjugation</u>. Subjugation is a method whereby an individual is treated as a servant and told to do what the abuser says without regard to the individual's own thoughts, wishes or desires.

---

household member by isolating, exploiting, or regulating him or her. The term includes, but is not limited to:

(a)  Isolating the family or household member from his or her friends or family.

(b)  Controlling the amount of money accessible to the family or household member and how he or she spends such money.

(c)  Monitoring the family or household member's activities, communications, or movements.

(d)  Frequently engaging in conduct meant to demean degrade, dehumanize, or embarrass the family or household member.

(e)  Threatening to cause physical harm to or kill a child or relative of the family or household member.

(f)  Threatening to publish false information or make false reports to a law enforcement officer or other law enforcement personnel about the family or household member.

(g)  Damaging the family or household member's property, household goods, or personal effects.

(h)  Forcing the family or household member to participate in criminal activity.

f.    <u>Emotional abuse and degradation</u>. Emotional abuse functions to belittle an individual's sense of self and sense of self-worth leaving them more susceptible to the abuser's control and believing that the abuse is their fault.

g.    <u>Sleep deprivation</u>. Sleep deprivation is used to hinder an individual's ability to make rational decisions.

h.    <u>Economic abuse</u>. Economic abuse occurs when the abuser is in control of all the financial decisions.

i.    <u>Gaslighting</u>. Gaslighting is the act or practice of grossly misleading another individual, especially for one's own advantage. When repeatedly told that an individual's perception of reality is mistaken, that individual may start to feel destabilized.

j.    <u>Animal Abuse.</u> Attempted and threatened violence toward an individual's animal.

9.    As set forth in more detail below, Hadley has terrorized D.H. by weaponizing every facet of coercive control including but not limited to:

- Indoctrination – convincing D.H. he is a god, is always right, that she should only speak when spoken to, and that she should never interrupt him;

- Isolation and Gaslighting – telling D.H. that her family doesn't care about her or love her and that she had no friends, thus she should make him the center of her world and distance herself from her selfish and unworthy family and friends;

- Degradation – constantly telling her that she is stupid, unworthy, dumb, and the opposite of her successful mother, as well as that her mother and other family members think she is stupid;

- Subjugation – requiring her to procure him fresh meals at daily prearranged times, and to do so, just like a slave, she must drop whatever she is doing to ensure he is fed and that she completes this essential task;

- Economic Abuse – having D.H. fund his every request including forcing her to alternatively demand and beg her family for money, turning over her entire salary

5

directly to him, selling every item she owns and turning over the proceeds to him, and being required to ask permission even to buy a cup of tea;

- Animal Abuse – snatching away her dog Nina as punishment if she has committed any perceived slights, and threatening to never return her;

- Surveillance - digitally stalking D.H. and her entire family through the family's home security systems, demanding that D.H. send him a picture, video, or security camera footage of where she is at any given movement to exert total control over her movements and to ensure her family has no chance to rescue her;

- Physical Abuse – assault, choking and raping her with no fear of consequence.

10.    Sadly, when the family learned the degree of Hadley's abuse and his calculated tactics, their united attempts to try to save D.H. failed.  In response to Plaintiffs' efforts to rescue D.H. from Hadley's abuse, Hadley has resorted to retaliation by using D.H. to threaten to sue Desiree and others for their attempts to help D.H. and to seek justice. Hadley's malicious intentions were made disturbingly clear and were articulated openly in chilling audio recorded phone calls from jail where Hadley was held for abusing D.H.  In these calls, Hadley boasted of his pursuit of a financial "payday," from the family declaring, "I gotta get that payday," and "Payday's gonna be all worth it," callously celebrating the potential rewards he planned to reap from Desiree's and her family's torment and grief.

11.    However, neither Desiree nor anyone in her family will be deterred by Hadley's false claims and manipulative ruthless threats and now seek to reclaim their dignity and some of their losses, by asserting claims under the federal Computer Fraud and Abuse Act, 28 U.S.C. § 1030, the federal Stored Communications Action, 18 U.S.C. § 2701, the Florida Security of Communications Act, § 934.03, Fla. Stat, and Florida common law, seeking statutory,

compensatory, and punitive damages for Hadley's unauthorized surveillance, intentional infliction of emotional distress, invasion of privacy, and the nuisance he maliciously inflicted upon this family.

## **PARTIES**

12.    Plaintiff Desiree Perez is an individual, currently residing in New Jersey.

13.    Plaintiff Olga Zayas is an individual, currently residing in Miami-Dade County, Florida.

14.    Plaintiff Miladys Garcia Gonzalez is an individual, currently residing in Miami-Dade County, Florida.

15.    Plaintiff Denise Milagros Gonzalez Escribano is an individual, currently residing in Brooklyn, New York.

16.     Defendant, Javon Hadley is an individual, currently residing in Miami-Dade County, Florida.

## **JURISDICTION**

17.    This Court has personal jurisdiction over Hadley because he resides in Florida, and the acts giving rise to this Complaint occurred in Florida.

18.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claim under 18 U.S.C. § 1030 arises under federal law.

19.    This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, because those claims arise under the same common nucleus of operative fact as the federal law claim.

## VENUE

20.     Venue is proper in this Court under 28 U.S.C. 1391(b) because Defendant Hadley resides in this district, and a substantial part of the events giving rise to Plaintiffs' claims took place within this district.

## FACTUAL ALLEGATIONS

### Desiree Installs Security Systems at Her Miami Dade Homes at D.H.'s Insistence

21.     Desiree owned two homes in Miami-Dade County, the Family Home and Minita's Home (collectively the "Residences"), for the purpose of providing a safe, secure, and comfortable environment for her loved ones.

22.     The Family Home has long served as the place at which Julio and Olga reside. D.H. lived at the Family Home with her grandparents between 2018 to 2023.  Similarly, Hadley spent significant time at the Family Home and indeed officially moved into the Family Home in 2022.

23.     Given Julio's ongoing struggle with dementia, a condition requiring constant care, the family was determined to ensure he received the proper attention and support he needed.  To that end, in June 2021, at D.H.'s request, Desiree hired a professional security consultant to install a high-end surveillance system in the common areas of the Family Home.

24.     In early 2022, after unidentified men approached the property with flashlights and potential weapons, Desiree and D.H. discussed adding additional security cameras to the preexisting surveillance system. D.H. specifically requested the addition of cameras with audio and color capabilities, later emphasizing the need for cameras in every room to monitor the administration of medication to Julio by caregivers when family members were absent.

25.     The additional cameras, both interior and exterior, were placed in common areas. The cameras recorded both video and audio, used state-of-the-art technology for high-quality monitoring, were accessible via an app which provided remote access, and were secured by a

password and encrypted data.  Desiree also installed the same video surveillance system at her mother Minita's home.

26.      As agreed, Desiree granted D.H. access to the security system and thus the cameras, solely to monitor Julio and Minita to ensure their safety and security.  At no point was D.H. authorized to use or share passwords, transmit, or share video or audio footage, nor was she authorized to grant access to anyone else.

**Hadley Threatens and Intimidates D.H. Demanding Access to the Security System for the Express Purpose of Monitoring D.H., Plaintiffs and the Extended Family**

*Surveillance*

27.      Hadley was fully aware of the surveillance systems' presence, the locations of the cameras, and their ability to record both video and audio.  Further, he knew that Desiree had not authorized him to access the security systems at any time.

28.      Undeterred, Hadley demanded that D.H. secretly provide him access to the systems without consent from Desiree or other family members.  Further, Hadley regularly accessed D.H.'s phone using her passcode, which provided him with an additional method to access the security system's cameras.

29.      Unbeknownst to Desiree or her family, Hadley used her security systems to terrorize and monitor D.H., Desiree, and other family members, including, but not limited to, eavesdropping on private conversations, tracking their whereabouts, and observing Desiree during her visits to her father.  Despite the fact that Desiree did not live at either of the Residences, Hadley was fixated on monitoring her movements during her visits to her parents.

30.      Disturbingly, Hadley consistently tried to drive a wedge between D.H. and her family, telling her they were untrustworthy and needed to be watched.  Hadley's paranoia and false narrative to D.H. was often coupled with threats to break the close family bond that D.H. had with

her family.  For example, on July 5, 2021, Hadley texted D.H. referencing Desiree who was visiting

the Family Home: "You better handle her," and "If she is here I need her to be watched the whole

time."  Other text messages to D.H. reveal that he was constantly telling her that Desiree and the

rest of her family lied, were not to be trusted, and caused them bad luck.

31.     On July 5, 2021, he[3] also texted: "And when they around that house anybody from

that side you need to have eyes on them," "Period," "Because if I catch them im [sic] telling you

ima [sic] go to jail…starting with the men…Ima [sic] shake shit up soon."  These text messages

constitute an obvious threat by Hadley to harm Julio, D.H.'s grandfather, who was the only male

residing in the home, 88 years old, and suffering from dementia.  Hadley even acknowledged that

he was willing to go to jail for assault in order to exert his dominance and control over the family.



32.     Utilizing threats of physical abuse, intimidation, and abandonment to force her into

compliance, Hadley coerced D.H. into providing the password to the app for the surveillance

cameras, thereby gaining unauthorized access to the cameras' audio and visual feeds.

---

[3] For clarification in the text message images, "My Outlaw" followed by emojis, refers to Hadley. This is the nickname D.H. used for Hadley as saved in the contacts on her cell phone.

33.     For example, on April 10, 2022, at Desiree's request, D.H. went to her grandmother Minita's home to check on her as Desiree believed Minita was suffering from a health crisis. Hadley sent D.H. a series of threatening texts demanding access to the security system at Minita's house to confirm that D.H. was in fact at that location.  Later that night, Hadley texted D.H. again demanding proof that Desiree had really asked D.H. to check on Minita.  Hadley further demanded access to the security system at Minita's house to check the footage himself, insisting D.H. provide him with the login information.  In response to Hadley's outrageous and deranged demands, D.H. texted him the username and password to access the Minita's security system.  Unable to access the cameras, Hadley became enraged.  He texted D.H.: "[t]he camera's password isn't working," followed by chilling ultimatums: "I'm gonna need some proof or I'll need my boots[4]" and "If I don't have that, your ass is in trouble."  Hadley's demands for the surveillance system login information and video proof of her location were relentless.  Hadley threatened, "If I don't have the screenshot by an hour I'm going ho[me]," followed by "And that's your ass."  These statements, among others, demonstrate a blatant act of intimidation and coercion designed to instill fear and manipulate D.H. into compliance.  His threats and intimidation went on for hours.

---

[4] The expression "put my boots on" is prison slang for "getting ready for a fight" or an ass-kicking.  *See* www.urbandictionary.com/define.php?term=put%20my%20boots%20on



| Now you can't answer |
| Dam I guess not |
| What's the app and password to the cameras |
| Username dnilope13 Password Epifanio27 |
| Screenshot your mom telling you when to slide to your grandmas |
| Or call Log tie |
| Time |
| Lol |
| Ok |
| The cameras password not working |
| I can have my abuela send me a screenshot of me pulling up to her house on the cameras |
| Want that? I can ask her for that tomorrow so u can see I went to my abuelas house |
| Hold on let me log out and see |
| Nigha they both lie |







34.     Because D.H.'s attempts to share the login information and to reset the password at Hadley insistence were unsuccessful on this occasion, D.H. contacted Desiree. After 11:00 pm on April 10, 2022, still being harassed and threatened by Hadley to provide proof of her previous location, D.H. frantically texted Desiree asking her for the login information and then to obtain a screenshot with time stamps of D.H. arriving at Minita's house earlier that day. When Desiree asked why D.H. would need this information, D.H. made up a story that she was concerned that someone had approached her vehicle for an extended period of time when she arrived at Minita's house. Desiree then sent D.H. a text message with the footage as requested, never dreaming that D.H. was so petrified of Hadley that she needed to obtain footage to prove to Hadley where she had been or face his wrath.



35.     Text messages reveal that Hadley was threatening D.H. and trying to access the security system to Minia's house until almost 2:00 am on April 11, 2022.

36.     The next day, April 11, 2022, at 7:00 a.m. D.H. returned to Minita's house to access the camera footage and the system attempting to appease Hadley, who was still furious that he could not access the system.  After she arrived, D.H. discovered Minita laying on the floor clearly ill and texted Desiree.  Desiree immediately instructed D.H. to call the paramedics. D.H., did so, but then picked up Minita's phone while Minita was still laying on the floor, suffering from what they later learned was a stroke, to access the camera footage on Minita's phone to prove to Hadley her whereabouts.  Shockingly, even though Minita was laying on the floor mid-stroke, and the paramedics had not yet arrived, D.H. rushed out of the house in terror because Hadley demanded she go attend to their landscaping business, Peacock.

37.     Indeed, Desiree was anxiously calling D.H. for an update on Minita's situation, but D.H. did not pick up.  Desperate to know what was happening to her mother, Desiree had to call their dogwalker to go to her mother's residence, which she did.  Ultimately, the paramedics arrived to find Minita on the floor mid-stroke.  Desiree was devastated about the situation as she knew that D.H. was close to her grandmother and could not comprehend why D.H. abandoned her grandmother in peril.  Little did Desiree know that this occurred because Hadley was threatening D.H.





| | | | I have no reason to lie to you |
| | | | Like I thought |
| | | | Nothing |
| | | | Everything is rocket science now |
| | | | Exactly what I said last night "the camera not working " |
| | | | I'm going to get it now their callo an ambulance my abuela is sick I swear to god |
| | | | I'm going to call now I have bo reason to lie u saw my gps Javon |
| | | | She's having a stroke |
| | | | Yea ok |
| | | | Sure |
| | | | I swear Javon my God I'm not lying please I'm on her phone trying to get info |
| | | | I'll send once I have |
| | | | I have no reason to lie u have my geico u have everything |
| | | | Your on the app |





38. Later, in July 2023, Desiree for the first time learned that Hadley was accessing the surveillance system at the Residences without her permission and cut off access to protect her family's privacy. Indeed. Desiree changed the password to the mobile application controlling the surveillance system, effectively cutting off Hadley and D.H.'s access. In early August, Hadley is communicating with D.H. about losing access to the video feed.



### Hadley Repeatedly Physically and Emotionally Abuses, Indoctrinates, Isolates, Subjugates, and Degrades D.H. in the Family Home

*A.  Physical and Sexual Abuse*

39. Defendant Hadley's threats of physical abuse were not empty threats—he repeatedly beat D.H. and demonstrated that there were consequences to her noncompliance with his demands. Hadley's violent behavior occurred within the home where Julio and Olga and other relatives were living, creating an atmosphere of fear and instability that inflicted emotional and psychological harm, disrupted the family's sense of safety, and left lasting trauma in a household that had once been a place of refuge.

40. In July 2022, Denise, then residing at the Family Home, was horrified when D.H. confided in her about an incident of sexual violence. According to D.H., Hadley had kept her awake the night before by giving her a caffeinated drink and, despite her saying no, raped her. D.H. told Denise that being forced to have sex was a way for Hadley to fix arguments. Hearing

that Hadley sexually assaulted D.H. in what was supposed to be a safe home left Denise traumatized.

41.     D.H.'s family was aware that Hadley owned a firearm. Indeed, D.H. reported to Denise on multiple occasions that Hadley carried a gun everywhere.  The possession and carrying of a firearm only increased the perpetual fear within which D.H. was living, in addition to placing everyone else in the Family Home in fear because of Hadley's angry outbursts and abuse and gun possession.

42.     D.H. continuously showed scrapes, bruises, and cuts, indicating physical abuse.



43.     On August 11, 2023, Millie became so concerned for D.H.'s safety that she contacted Desiree, who was in New York, to report that Millie feared Hadley would hurt D.H. Millie advised Desiree that even Julio, despite having dementia, was extremely anxious and agitated at the precarious situation in the Family Home and feared Hadley.  Desiree immediately checked the security cameras within the common areas of the home and observed Hadley yelling at D.H.  At one point, Desiree saw her daughter retreat into a corner of the house's outdoor space, right next to one of the security cameras, and stand meekly with her hands held behind her back.

44.     Just one month later, on September 11, 2023, Olga and Millie were in the Family Home when they heard raised voices coming from the bedroom shared by D.H. and Hadley and then heard a slapping noise.  Olga and Millie then heard D.H. crying and yelling "don't hit me, don't hurt me."  Both, terrified for D.H.'s safety, entered the bedroom where they observed D.H. cowering in the corner of the room pinned by Hadley against the wall.  They also observed that Hadley had his arm raised above his head poised to strike D.H. Olga and Millie clearly observed that the left side of D.H.'s face was red as if D.H. had been struck in the face by Hadley before Olga entered the room.  Then, to protect D.H. from further assault, Olga inserted herself between Hadley and D.H., shielding D.H. with her body.  Olga was terrified but determined to protect her granddaughter.  Hadley continued to scream, yell and gesticulate wildly, terrifying Olga and Millie.  Olga became so afraid of what Hadley would do that she ran out of the room, grabbed a machete and reentered the room, determined to protect D.H. and herself.  Olga remained fearful, frightened and shocked by the attack and by Hadley's angry violent behavior.  Millie was likewise deathly afraid for the safety of both D.H. and Olga.  So much so that she left the house to summon the police as she was afraid Hadley was going to kill them all.

45.     Desiree was alerted to the situation and immediately called D.H., but Hadley, in another example of exerting control over D.H., answered D.H.'s phone.  Hadley sounded incoherent and his rage was palpable. Fearing for her daughter's life, Desiree attempted to calm and distract Hadley, trying to buy time until help arrived.

46.     About an hour later, law enforcement responded to the scene.  They questioned D.H. only two feet from Hadley.  D.H. lied to the police, who ultimately made no arrest at the time.

47.     After the incident, D.H. called a friend, and the video surveillance recorded her telling her friend that Hadley had grabbed her by the neck.

48.     Over the course of D.H.'s relationship with Hadley Plaintiffs repeatedly observed bruises, scratches, and other injuries on D.H.'s body.  Aware of the escalating danger, D.H. herself, began quietly documenting her injuries and saving them on devices later recovered from the Family Home.

49.     For example, on October 19, 2023, during a video call, Denise noticed a fresh knee injury.   When asked, D.H. insisted she had fallen while playing sports with relatives—an explanation that, like so many others, appeared to deflect concern and conceal the truth of Hadley's ongoing abuse.

**B.      *Emotional Abuse and Degradation, Indoctrination, Isolation, Subjugation, and Manipulation***

50.     Hadley's pattern of using other methods to control D.H. contaminated the atmosphere of the household, affecting not only D.H. but every person who lived under that roof.

51.     Family members regularly overheard verbal tirades and witnessed Hadley denying D.H. entry to their shared bedroom as a form of punishment.

52.     On one occasion, Olga witnessed Hadley outside the home pinning D.H. up against the house while shoving a fist into D.H.'s stomach, but D.H. later came into the house and denied the incident.

53.     Further, on June 6, 2023, the home's security system captured audio of one such episode:

> HADLEY:  You a fucking retarded bitch. Everybody want what you got, and you don't even know it, 'cause you want what everybody else got, stupid ass. You don't even see it, fucking retarded bitch. Bet I made some sense tonight, though. Didn't I make some sense tonight? I'm talking to you!
>
> D.H.: Yes.

HADLEY: I'm never wrong, either. Check my resume. Yo.

D.H.: Yes.

HADLEY: This whole week, don't come in this room.

54.     Family members also witnessed that Hadley was laser focused on getting money from D.H..  Aside from controlling all of the money from their supposed joint landscaping business, Peacock, Hadley demanded payment from D.H. that she earned from her regular daytime job.  Text messages also confirm that Hadley used threats against D.H. on a regular basis relating to Peacock and sometimes relating .

55.     For example, on June 14, 2023, Hadley texted D.H.: "All I know is you better hope they fuking truk can fit" [….] "If it's trash and trees blocking side entrance of the lot and they can't get close enough on outside that's your ass" [….] "You better pray I'm telling you im going to devour your hopes n dreams if it doesn't fit" [….] "All I'm saying is you better fix it or I'll fix you."  These test messages are direct threats of harm against D.H.  The text messages leading up to these threats reveal that Hadley was upset that the truck used to do lawn work may not fit through the entrance of a job site scheduled by D.H. Hadley was clearly threatening that if the truck did not fit, he would harm D.H.

56.     Despite the initial understanding that Peacock was a joint business venture between Hadley and D.H., which D.H. funded through loans that her mother later paid off for her, Hadley was obsessed with diminishing D.H.'s interest in the business.  In fact, as observed by her family, D.H. did not keep or control any money.  Still, Hadley threatened her to force her to reduce her percentage.  On September 9, 2023, a couple of days before he assaulted her and again tried to get her to reduce her percentage, the following was recorded:

HADLEY: Man talk. Bitch you never disagree with me. Nobody disagrees with me. I'm

the right motherfucker DAHHH. If you disagree with me, you're stupid.

\* \* \*

D.H.: Why would I do a percentage change?

HADLEY: Because I'm the fucking boss and I feel like doing a percentage change.

D.H.: No.

HADLEY: No, bitch, I'm the boss.

57.     Hadley had so much control over D.H. that he repeatedly had her say or do things

that were demeaning and aimed to humiliate her.  In text messages D.H. sent to Hadley on October

18, 2023, D.H. pleaded, "You told me in order for u to not leave me to get on my knees"; "I'll do

what you said"; "You said later tonight or tomorrow I could get on my knees" and "I'll suck your

dick tonight and get on my knees."  You can then hear what sounds like Hadley pushing her out

of the door and slamming the door shut.



58.     Even on those occasions where D.H. was not allowed to sleep in or enter the bedroom, Hadley forced D.H. to make him lunch and dinner and bring the food to the bedroom door.

59.     In text messages with Hadley the following day, on October 19, 2023, D.H. promised, "You won't lose anything because We made an agreement last night that **I will do everything you say**. Last night was the last time this ever happens. I will do what I say. I'll never ruin anything because I love you."

60.     Hadley routinely called D.H. derogatory names such as "stupid," "dumb," "dummy," "lazy," and a "bitch."  For example, on November 19, 2023, in text messages, D.H. begged Hadley:

> Javon please I admit I was wrong for yelling and raising my voice but when I don't do that you insult me and **call me bitch dummy** and **say talk again I'll slap u in the face you've done that just yesterday**. I get you saying it's out of reaction to me over talking
>
> Idk why you feel that way because I have never called you a name in my life. You have the power I do what you say. I don't ever tell you what to do
>
> You overpower me

(Emphasis added).

61.     Just a couple of days later, on November 22, 2023, Hadley expressed to D.H. that he was upset with her, telling her to "Stfu" [shut the fuck up] and calling her a "dumb bitch." D.H. responded, "I said I will do everything needed to make it up I said that on the phone. And I will." His response: "You can [sic] even shut up while I talk dummy."

62.     On December 1, 2023, Hadley continued his pattern of verbal abuse, degradation, and isolation in the Family Home. After D.H. missed his call, he lashed out by stating, "Don't sleep in my bed until after the holidays," followed by: "Stfu" and "All December, don't come around me unless you sucking dick or massaging." These remarks were intended to humiliate, control, and sexually coerce D.H.



63.     That same day, Hadley also tried to weaponize D.H.'s family against her by suggesting that they thought she was unintelligent and not good enough for Hadley. In a text message Hadley sent to D.H. on December 1, 2023, he wrote, "Your [sic] not mature enough for me Olga was right Minerva was right Dez was right." Your [sic] not smart enough or equipped and your [sic] a bitch all them say that and you know it."

64.     On December 13, 2023, D.H. wrote, "I got on my knees like you asked and apologized" and bargained, "please I will do everything needed it won't ever happen again. I'll sleep in [sic] couch and I'll never ever make you react this way I promise"; "No Javon please please I got on my knees and I'll go upstairs now again"; "I'll do everything you said please"; "This won't happen again please"; "I'll get on my knees again I'll do whatever."

65.     Hadley's tactics to control D.H. included calling her incessantly when she was not at the Family Home.  Hadley became angry whenever D.H. was not home, especially if she was with family.  Consequently, D.H. was constantly petrified and in a rush.  D.H. often recorded herself on her phone while driving to demonstrate her whereabouts to Hadley.

66.     Hadley also excessively controlled D.H.'s spending and relationships.  D.H. had to pay Hadley weekly fees from her payroll check that she called "funding."  She was not allowed to spend money without this approval.  Denise was troubled that D.H. had to ask for permission to make even small purchases.  Densie recalls one instance when D.H. was not permitted to buy herself a tea at Starbucks and Denise ended up paying for it.  Hadley also searched D.H.'s phone and D.H. was not allowed to keep photos of friends or others.  This caused Denise extreme concern and distress.

67.     Over time, family members witnessed marked changes in D.H.'s behavior.  She became anxious, paranoid, and fearful, moving through the home with a sense of hypervigilance.  Denise later reported that D.H. confided thoughts of suicide, a cry for help amid the escalating abuse.  Family members eventually feared D.H. was abusing prescription drugs to help cope with the abuse.

68.     Denise later reported to the police that D.H. was afraid that something bad would happen to her or her relatives, including her grandparents.  D.H. felt that there were cars that were

following her.  For that reason, on one occasion, D.H. hid her grandfather in a room so that something would not happen to him.

<u>**Desiree Discovers Some of Hadley's Abuse of Her Daughter on Security Systems**</u>

69.      A family member later discovered additional footage that captured examples of Hadley's abusive conduct that was later provided to Desiree.  The footage included video from January 16, 2022, and audio from September 11, 2023—both documenting disturbing incidents of violence and harassment that had taken place inside the Family Home.

70.      In the first such instance, Desiree observed that on January 16, 2022, Hadley approached D.H., as she retreated in fear, punched her in the head, grabbed her by the arm, and shoved her through a door into the Family Home all of which was captured by the Security Systems.



71.      Desiree also listened to the audio from the September 11, 2023 incident, which captured the verbal, physical, and emotional abuse her daughter endured that day.  The audio recording told a harrowing story.  Desiree had already been deeply shaken by the incident having experienced the aftermath of it herself on the phone, but hearing the recording of what Hadley did

to D.H. further traumatized her. (A recording of the September 11, 2023 incident is available at: [Audio Link]).[5]

72.     In the September 11, 2023 recording, Hadley is heard screaming at D.H. and angrily demanding that she reduce her "percentage," referring to her percentage of income from their joint lawn service business.  He repeatedly ordered her to lower it to five percent saying, "Five percent – change your percentage to five percent. I'll pay you what I want to pay you because you going to be a – five percent D.H."  Suddenly, the sound of a drawer opening is followed by a loud thumping noise, resembling a gun being slammed onto to a surface.  Hadley then coldly asked, "You cool with five percent?"

73.     D.H. replied, "Please don't," and began crying. Hadley yelled at her to "Shut up!" and then a sound like someone being slapped can be heard.  Hadley then mockingly tells her "Man, stop it." and, moments later, adds, "You fake ass crying. I feel like breaking this motherfucker." Then, the sound of a drawer closing is heard, indicating the gun was returned to where it was taken from.

74.     Hadley then said, "Fucking my momma, my momma. You know, your momma thinks you're the dumbest motherfucker? No, look me in my eye. Look me in my eye. Look me in my eye. Look at me when I'm talking to you. Look me in my eye."  D.H. then replied, "Stop hurting [or hitting] me."  Hadley responds, "Nobody hurting [or hitting] you. Look me in my eye when I'm talking to you."  Then, the recording captures Olga and Millie entering the room.

---

[5]

https://nam11.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.dropbox.com%2Fscl%2Ffo%2F6fpk4uupdu0hso2dbdfc3%2FAGtb4DuZQv0b3l0tyt3_c7A%3Frlkey%3Dbpb5wez8uiu8dxul8jyiutesn%26st%3Dp0y1faoj%26dl%3D0&data=05%7C02%7Cbarbara.martinez%40hklaw.com%7Ce56bb080af14b67380408dd762b4dc1%7Cf033c460c093c408fbc92eceb0c22c8c4%7C1%7C0%7C638796650581547250%7CUnknown%7CTWFpbGZsb3d8eyJFbXB0eU1hcGkOnRydWUsIlYiOiIwLjAuMDAwMCIsIlAiOiJXaW4zMiIsIkFOIjoiTWFpbCIsIldUIjoyfQ%3D%3D%7C0%7C%7C%7C&sdata=tthKnr4OdrbaxMY41K8cKF8Y%2Fg7LD8hRqPb900WFEhs%3D&reserved=0

75.     Hadley recognized that his abuse was being recorded but believed himself to be untouchable because of his abusive control over D.H..  On November 19, 2023, a text message from Hadley demonstrates that he arrogantly assumed that the evidence would never be enough to hold him accountable for his violent attacks against D.H. and the lasting emotional harm he has caused for Desiree and her loved ones.



76.     Traumatized by the recordings of D.H.'s abuse, in December 2023, Desiree reported Hadley to law enforcement.  On December 30, 2023, the police arrested Hadley for the January 14, 2022 punch to the head, which was captured on video.

77.     Unfortunately, the Miami-Dade State Attorney's Office declined to act on the case. Once that occurred, however, Desiree, Olga, Millie and other family members circled back with the Miami-Dade police department and asked them to consider arresting Hadley for the September 11, 2023 incident.  Thereafter, Hadley was arrested for that assault on April 5, 2024.

78.     Sadly, Desiree's discovery of the security system recordings was only the beginning of evidence discovered that corroborated and further detailed the horror that D.H. and others in the Family Home had endured.  Shortly after Hadley's arrest, D.H. and Hadley moved out of the Family Home in September 2023, after the assault on September 11, 2023.  D.H. left an old cell phone and a download of her cell phone which she had synced to a computer at the Family Home.  Desiree then reviewed the shocking content that these abandoned items, including a very

recording on D.H.'s phone in which she says, "This is not rape. I'm doing what I want to do." You can hear another man talking in the background and Hadley responding, "What, the fuck? No, rape is stupid. A video."  The recording is dated July 18, 2022, the same day D.H. had texted Milly to tell her Hadley had raped her.  The video captures D.H. and Hadley in the bedroom.



**Hadley's Negative Impact on D.H.'s Mental Health
as Witnessed by Plaintiffs and Others**

79.     After suffering under this tremendous abuse for some time, D.H. began telling "stories" to family members about "strangers" who were victims of human trafficking.  Olga and others heard D.H. say things that were exaggerated and untrue.  For example, on one occasion, D.H. called Olga shortly after leaving the Family Home and told Olga that she saw a girl sitting in the park who she believed was being sex trafficked and demanded that she and Olga help this young woman.  While D.H. was telling this story, she was sobbing.  Olga asked her if she got out of the car, D.H. replied that no, that she had just seen the young woman on the floor in the park, and added "I know she's being trafficked."  D.H. kept yelling at Olga, "You have to help her" in a frantic and sobbing voice.

80.     Family members also noticed that D.H.'s speech was becoming increasingly slurred, she had become easily agitated and angry, and seemed delusional, at times even incoherent.  So much so, that some family members strongly believed that she was abusing prescription drugs.

81.     In fact, text messages and recordings reflect that D.H. was suffering trauma and was suicidal.  These texts were gut wrenching for Desiree to read.  Desiree also found a note D.H. made on her phone dated May 11, 2022, in which D.H. said that she felt dead inside.



82.     Unfortunately, Hadley's arrests only further exacerbated D.H.'s mental volatility, further tearing the fabric of the family relationship.  D.H. lashed out at Desiree and even threatened to "blast" and embarrass her publicly if Desiree did not seek to have Hadley released after his first arrest in December 2023.

83.     Finally, after finding and assessing the overwhelming evidence of Hadley's brutal abuse, the entire family came together, shared their individual experiences, and because of D.H.'s clear mental health deterioration, they collectively agreed that D.H. needed professional help.

84.     Indeed, D.H.'s family agreed that they had recently observed that her speech was slurred, she was becoming agitated and angry easily, and she seemed delusional, at times even incoherent.

85.     Fearing that D.H. was at risk of suicide and simultaneously abusing prescription drugs, the Family decided to seek help, filing first a Baker Act petition and then a Marchman Act

petition, praying that medical professionals would identify D.H.'s mental health issues and save her from the nightmare which had become her daily life.

86.     Unfortunately, D.H. left treatment without getting the long-term therapy she needed and went right back to her abuser, a common but unfathomable occurrence.  Shortly thereafter, to the horror of the entire Family, the two married.  It is worth noting that, in a jail call after his arrest, Hadley was recorded stating that marrying D.H. meant she cannot testify against him.

### Desiree and Family Members Endure Severe Emotional Distress and Significant Remediation Costs

87.     Desiree's discovery of the recordings of D.H.'s brutal abuse caused her overwhelming distress and fear for her daughter.  To learn that the Family Home was being used to terrorize, humiliate, and degrade D.H., along with instilling fear and horror to everyone else who resided in the family home that was meant to keep everyone safe has been extremely agonizing and harmful.

88.     Once the scope of what D.H. had been living with under Hadley's control began to emerge, Desiree, Olga, Millie, Denise and the others became overwhelmed by fear and anxiety. Witnessing D.H.'s abuse, coupled with the ongoing threat from Hadley, made it impossible for anyone in the household to feel safe or carry on with daily routines.  Desiree, Olga, Millie, Denise and the other family members were plagued by sleepless nights and constant worry for D.H.'s safety and her mental stability.

89.     Olga, terrified by the abuse she witnessed, was paralyzed with fear for D.H.'s safety. She described hearing D.H. scream "Mama Mai" in terror, pleading with Hadley not to hurt her. These traumatic experiences left Olga overwhelmed with helplessness and a long-standing feeling of dread.

90.     Millie was similarly affected, experiencing intense fear and anxiety from the ongoing abuse, and lived in constant fear for D.H.'s well-being and that of Julio, Olga and her own.

91.     Additionally, Denise, aside from the trauma of witnessing the abuse, was consumed with guilt for not being able to protect D.H., adding to the emotional toll on the family.

92.     Distressed and overwhelmed by what she had witnessed and experienced, Desiree also sought professional help and contacted a psychologist for guidance on how to cope with the trauma and emotional toll of the situation.

93.      Further, Desiree, knowing that Hadley, driven by a bizarre and sadistic obsession, logged into the surveillance cameras and watched and listened to Desiree and her family during their most private moments—clearly intending to exploit their vulnerabilities—caused her immense harm.  This violation has left a lasting emotional and physical toll on Desiree, Olga, Millie, Denise and the rest of the family.

94.     In addition to emotional harm, Desiree has had to hire professional security consultants at a substantial cost to re-secure the systems, re-establish network security, and conduct an investigation into the breaches of her privacy.  Further, she has paid for professional help from psychologists, abuse experts and lawyers.  These costs total more than $2,000,000.  Additionally, the security systems were inoperable for a certain time, leading to added expenses for in-house overnight care for her father and other associated costs.

### COUNT I
### VIOLATION OF FEDERAL COMPUTER FRAUD AND ABUSE ACT
### 18 U.S.C. § 1030

95.     Plaintiffs incorporate paragraphs 1-94 of this Complaint as though fully set forth herein.

96. The Family Home's security systems and phone qualify as "protected computers" under 18 U.S.C. § 1030(e)(2), as they are used in and affect interstate or foreign commerce. Desiree regularly travels within the U.S. for work, and her security systems enable remote access, monitoring, and communication for safety purposes, including audio and video.  She also uses her phone for communication and managing these systems globally, for both personal and business needs.

97. Desiree took reasonable and appropriate measures to maintain and secure her surveillance system, and at no point did she authorize Hadley to access these systems.

98. Hadley violated the Computer Fraud and Abuse Act by intentionally accessing the protected computers without authorization and obtaining sensitive information.  He knowingly intercepted audio and visual transmissions of Desiree, Olga, Millie and Denise by accessing Desiree's security systems and, without consent, using passwords he knew he was not authorized to use.

99. Hadley knowingly intercepted Plaintiffs' wire and electronic communications, including audio and video, without authorization and with malicious intent to harm and monitor Desiree, Olga, Millie, Denise and others, while maintaining abusive control over D.H.

100. Hadley unlawfully accessed the security systems using physical and mental assault, coupled with threats of further harm.

101. As a direct result of Hadley's unlawful conduct, Desiree incurred significant losses, spending time, money, and resources to investigate the intrusion, assess the damage—including the deletion and alteration of data caused by Hadley's unauthorized access—and to restore her systems to their secure and original state.  The total expenditure amounts to in excess of $5,000.

102.     Wherefore Desiree seeks all relief available under 18 U.S.C. § 2520, including actual damages, punitive damages, attorney's fees, costs, and any further relief the Court deems just and proper.

## COUNT II
## VIOLATION OF THE STORED COMMUNICATIONS ACT
### 18  U.S.C. § 2701

103.     Plaintiffs incorporate paragraphs 1-94 of this Complaint as though fully set forth herein.

104.     Plaintiffs assert this Claim for Relief against the Defendant pursuant to 18 U.S.C. § 2701 of the Federal Stored Communications Act ("SCA").

105.     The Family Home's security systems and phone are used in and affect interstate or foreign commerce.  Desiree regularly travels within the U.S. for work, and her security systems enable remote access, monitoring, and communication for safety purposes, including audio and video.  She also uses her phone for communication and managing these systems globally, for both personal and business needs.

106.     Desiree took reasonable and appropriate measures to maintain and secure her surveillance system, and at no point did she authorize Hadley to access these systems.  Hadley never sought authorization from Desiree or Plaintiffs to access the Family Home's security systems.  The unauthorized access was to a facility to which an electronic communication service was provided.  Hadley violated Desiree and Plaintiffs' privacy by accessing and potentially storing private and confidential information from the Family Home.

107.     The video that Hadley used without access were electronically stored in interstate commerce.  Hadley intentionally accessed these stored communications without Desiree or Plaintiffs authority or approval.  Hadley knowingly intercepted Plaintiffs' wire and electronic

stored communications, including audio and video, without authorization and with malicious intent to harm and control Desiree, Olga, Millie, Denise and others, while satisfying his perverse desires and maintaining abusive control over D.H.

108. Hadley unlawfully accessed the security systems using physical and mental assault, coupled with threats of further harm.

109. As a direct result of Hadley's unlawful conduct, Desiree incurred significant losses and damages, spending time, money, and resources to investigate the intrusion, assess the damage—including the deletion and alteration of data caused by Hadley's unauthorized access—and to restore her systems to their secure and original state, and other damages not currently known.

110. Defendant's actions were knowing, intentional, wanton, and willful. As a result of Defendant's actions, Plaintiffs have sustained and will continue to sustain damages in an amount to be determined at trial. Plaintiffs are entitled to compensatory damages, statutory damages of $1,000 per violation, and other fees and costs to be determined at trial.

111. Wherefore Desiree seeks all relief available including actual damages, statutory damages, and other fees and costs to be determined at trial.

## COUNT III
## VIOLATION OF FEDERAL WIRETAP ACT, 18 U.S.C. § 2511

112. Plaintiffs incorporate paragraphs 1-94 of this Complaint as though fully set forth herein.

113. Hadley, without authorization or consent, intentionally intercepted, endeavored to intercept, and/or procured another person to intercept Desiree, Olga, Millie and Denise's wire, oral, and electronic communications, in violation of 18 U.S.C. § 2511.

114.     Hadley knowingly and willfully accessed Desiree, Olga, Millie, Denise and others' private communications, including audio and visual transmissions, by gaining unauthorized access to her security systems.  Hadley used passwords that he knew were not authorized for his use, directly intercepting communications between Desiree, Olga, Millie, Denise and their loved ones.

115.     Hadley's conduct also involved coercing D.H. to unlawfully access the security systems and Desiree's phone on his behalf, using threats of physical and mental harm to force compliance with his illegal actions.

116.     Hadley's interception of communications was done with the malicious intent to harm Desiree, Olga, Millie, Denise and others, and to maintain abusive control over D.H., in violation of federal law.

117.     As a direct result of Hadley's actions, Desiree has suffered actual damages, including but not limited to emotional distress, invasion of privacy, and harm to her personal and professional life, in addition to incurring costs associated with investigating and remedying the interception.

118.     Wherefore Desiree, Olga, Millie and Denise seek all available damages, including actual damages, punitive damages, liquidated damages of $100 per day for each day of violation (or $1,000, whichever is greater), and reasonable attorney's fees and costs incurred in prosecuting this action.

**COUNT IV**
**VIOLATION OF FLORIDA SECURITY OF**
**COMMUNICATIONS ACT, § 934.10, FLA. STAT.**

119.     Plaintiffs incorporate paragraphs 1-94 of this Complaint as though fully set forth herein.

120.    Hadley violated Fla. Stat. § 934.03 by intentionally intercepting, both directly and through D.H., and at times under threat of harm, Desiree, Olga, Millie and Denise's private wire, oral, and electronic communications.

121.    Hadley knowingly and willfully intercepted audio and visual transmissions of Desiree, Olga, Millie, Denise and their loved ones by accessing the Family Home's security systems without her authorization or consent.  Hadley used passwords he knew he was not authorized to access, to unlawfully intercept Desiree, Olga, Millie and Denise's communications and those of their loved ones.

122.    Hadley further coerced D.H. to obtain unauthorized access to the security systems, using physical and mental assault, and the threat of further violence against D.H..

123.    Hadley knowingly and willfully intercepted Desiree, Olga, Millie and Denise's wire and other electronic communications, including audio and video, without authorization and with malicious intent, intending to harm, monitor, and maintain abusive control over D.H..

124.    Wherefore Plaintiffs Desiree, Olga, Millie and Denise seek all relief available under § 934.10, Fla. Stat., including actual damages (not less than liquidated damages of $100 per day for each day of violation, or $1,000, whichever is greater), punitive damages, reasonable attorney's fees, litigation costs, and any further relief the Court deems just and proper.

<u>**COUNT V**</u>
**INVASION OF PRIVACY VIA INTRUSION UPON SECLUSION**

125.     Plaintiffs incorporate paragraphs 1-94 of this Complaint as though fully set forth herein.

126.    Hadley intentionally and without authorization gained remote access to the surveillance systems at Plaintiffs' Family Home, specifically to monitor and eavesdrop on the private activities of Plaintiffs.

127.     Plaintiffs have a justifiable and reasonable expectation of privacy in the Family Home, including the ability to engage in personal, family, and business conversations without unauthorized surveillance or intrusion.

128.     Hadley utilized intimidation, threats of bodily harm, and coercion to force D.H. to disclose the passwords to the surveillance systems, thereby enabling Hadley to access and monitor Plaintiffs' private activities.  Hadley had no legal or authorized purpose for obtaining this access.

129.     Hadley's actions were deliberate and intrusive, involving the unauthorized listening in on private conversations and viewing private moments via the audio-visual capabilities of the surveillance system.  These intrusions occurred in the private quarters of Plaintiffs' residences and were also aimed specifically at Desiree, Olga, Millie and Denise.

130.     The nature of Hadley's intrusions was highly offensive to a reasonable person. The acts of electronically monitoring conversations, including those that occurred in private, and doing so through unlawful and threatening means, constitutes a significant and highly offensive violation of Plaintiffs' right to privacy.

131.     Hadley knew or should have known that his conduct was unlawful and would cause severe emotional distress, embarrassment, humiliation, and mental anguish to Plaintiffs, and especially as to Desiree, Olga, Millie and Denise given that it was for the purpose of harming D.H., as well as because of Desiree's high-profile status and the intimate, personal nature of the conversations being monitored.

132.     Hadley's intrusions were unwarranted, malicious, and invasive of Plaintiffs' right to solitude and privacy. The intrusion into Plaintiffs' private affairs and seclusion was not only unnecessary but carried out with disregard for their privacy rights.

133.    Plaintiffs did not consent to any of the acts of intrusion upon their privacy and had no knowledge that their private activities were being monitored until after Hadley's actions were discovered.

134.    As a direct and proximate result of Hadley's conduct, Plaintiffs have suffered and continue to suffer from extreme and permanent emotional distress, mental anguish, harm to their interest in privacy, and impairment to their quality of life, including but not limited to personal humiliation, embarrassment, physical suffering, loss of security, and damage to her professional reputation.

135.    Wherefore Desiree, Olga, Millie and Denise seek all relief available, including actual damages, punitive damages, reasonable attorney's fees, litigation costs, and any further relief the Court deems just and proper.


## COUNT VI
## PRIVATE NUISANCE

136.    Plaintiffs incorporate paragraphs 1-94 of this Complaint as though fully set forth herein.

137.    This is an action for damages by Plaintiffs against Hadley whose actions constituted a private nuisance.

138.    Hadley engaged in conduct that constitutes a private nuisance by continuously physically and verbally abusing D.H. in the Family Home and in the presence of Plaintiffs.

139.    Hadley engaged in conduct that constitutes a private nuisance by continuously monitoring Plaintiffs in the privacy of their homes without Plaintiffs' knowledge or consent.

140.    Hadley's conduct disturbed Plaintiffs' free use, possession, and enjoyment of the property and rendered its ordinary use chaotic and emotionally intolerable.

141.    Hadley's conduct also rendered the property unsafe and insecure for Plaintiffs.

142.    Wherefore Plaintiffs seeks all relief available, including actual damages, punitive damages, reasonable attorney's fees, litigation costs, and any further relief the Court deems just and proper.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

143.    Plaintiffs incorporate paragraphs 1-94 of this Complaint as though fully set forth herein.

144.    This is a cause of action for intentional infliction of emotional distress by Plaintiffs against Hadley.

145.    Hadley engaged in intentional conduct that he knew or should have known would cause emotional distress to Plaintiffs.

146.    Hadley knew that Plaintiffs Desiree, Olga, Millie and Denise were present, watching him physically and mentally abuse D.H.

147.    Hadley's conduct was outrageous and went beyond all bounds of decency.

148.    Hadley knew that forcing Plaintiffs to witness him violently assaulting D.H. and learn about the rape and other abuse would cause Plaintiffs severe emotional distress.

149.    As a direct and proximate result of Hadley's intentional conduct, Plaintiffs have suffered severe emotional distress that has led to a litany of psychological and physical problems. Desiree has experienced ongoing anxiety, insomnia, and panic attacks stemming from the fear that Hadley might harm her daughter or other family members.  She has required psychological counseling and incurred extreme out-of-pocket expenses for security upgrades to regain a basic sense of safety in her own properties.  Milly has dealt with overwhelming anxiety and intense fear for her safety and for the safety of those also staying in the Family Home. Olga has become

increasingly withdrawn and fearful, often expressing terror and fear paralysis at the thought of Hadley returning and harming D.H. or herself.  Denise has experienced persistent feelings of guilt, helplessness, and depression, as well as a fear that she failed to protect D.H. from forceful harm. Plaintiffs' emotional and psychological suffering has been severe, ongoing, and deeply intertwined with Hadley's pattern of targeted, malicious, and outrageous abuse

150.    Wherefore Desiree, Olga, Millie and Denise seek all relief available, including actual damages, punitive damages, reasonable attorneys' fees, litigation costs, and any further relief the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully demand a jury trial and a judgment awarding statutory damages, compensatory damages, punitive damages, reasonable attorneys' fees and costs, and any further relief as the Court deems just and proper.

Dated: April 8, 2025                                          Respectfully submitted,

HOLLAND & KNIGHT LLP                 REED SMITH LLP
701 Brickell Avenue, Suite 3300               Southeast Financial Center,
Miami, FL 33131                                        200 S Biscayne Blvd., Suite 2600
Tel: (305) 374-8500                                   Miami, FL 33131
Fax: (305) 789-7799                                  Tel: (786) 747-0200
                                                               Fax: (786) 747 0299


By: */s/ Wifredo A. Ferrer*                      By: */s/ Lara T. Gatz*
   Wifredo A. Ferrer                                Lara T. Gatz (signed with permission)
   Florida Bar No.: 0887005                    Florida Bar No.: 1055385
   wifredo.ferrer@hklaw.com                  lgatz@reedsmith.com
   Barbara A. Martinez
   Florida Bar No.: 1031810
   barbara.martinez@hklaw.com
   Cary O. Aronovitz
   Florida Bar No.: 86425
   cary.aronovitz@hklaw.com